**Slip Op. 04–161**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| _____ | : | |
| ALLEGHENY BRADFORD | : | |
| CORPORATION, d/b/a TOP LINE | : | |
| PROCESS EQUIPMENT COMPANY, | : | |
|  | : | |
| Plaintiff, | : | |
|  | : | Court No. 02-00073 |
| v. | : | |
|  | : | |
| THE UNITED STATES, | : | |
|  | : | |
| Defendant. | : | |
| _____ | : | |

[Plaintiff's application for attorney fees and expenses granted.]

Dated:  December 23, 2004

Womble Carlyle Sandridge & Rice PLLC, (James K. Kearney) for plaintiff.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand), Philip J. Curtin, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

## OPINION

**RESTANI, Chief Judge:**

### INTRODUCTION

Plaintiff Allegheny Bradford Corporation, d/b/a Top Line Process Equipment Company ("Top Line") seeks an award of attorney fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412 (2002) ("EAJA").  Top Line incurred attorney fees and expenses in the course of a contempt proceeding against the Government, which liquidated Top Line's tube

fittings in violation of the court's injunction and then retained the monies exacted despite Top Line's requests for a remedy. Although the Government avoided a contempt holding by complying with a subsequent ruling of the court, see Allegheny Bradford Corp. v. United States, No. 02-00073, Slip Op. 04–44 (Ct. Int'l Trade April 29, 2004), the Government's position with regard to the illegal liquidations was not substantially justified. Accordingly, attorney fees and expenses in the amount of $28,015.78 are awarded to Top Line.

## BACKGROUND

The court assumes familiarity with its prior two opinions in this case. The first opinion ruled on Top Line's contempt motion and, rather than finding the Government in contempt for failing to remedy the illegal liquidations, ordered the Government to refund the monies exacted from Top Line as a result of those liquidations. See Allegheny Bradford, Slip Op. 04–44. The second opinion ruled on the underlying litigation, reversing the United States Department of Commerce's determination that Top Line's tube fittings were within the scope of an antidumping duty order. See Allegheny Bradford Corp. v. United States, No. 02-00073, Slip Op. 04–59 (Ct. Int'l Trade June 4, 2004) (reversing Final Scope Ruling on the Antidumping Duty Order on Stainless Steel Butt-Weld Pipe Fittings from Taiwan: Allegheny Bradford Corporation d/b/a Top Line Process Equipment, 66 Fed. Reg. 65,899 (Dept. Commerce Dec. 21, 2001) ("Final Affirmative Scope Ruling")).

In the prologue to the dispute over the illegal liquidations, Top Line moved for an injunction of liquidation for the duration of the scope litigation in order to preserve the status quo. Injunctive relief is made available under such circumstances by 19 U.S.C. § 1516a(c)(2) (2002), which permits the Court to enjoin the liquidation of merchandise subject to an

affirmative scope determination during the pendency of the litigation. See 19 U.S.C. §

1516a(c)(2). In this case, the court granted the motion on February 26, 2002, enjoining the

liquidation of Top Line's tube fittings from Taiwan during the pendency of the litigation

reviewing the Final Affirmative Scope Ruling. Top Line served the injunction on Commerce and

the United States Customs Service on March 4, 2002.[1]

Commerce did not issue instructions implementing the order until June 4, 2002. Though

these instructions were sent on June 4, they were not posted by Customs on its electronic bulletin

board until June 10. In the interim, on June 7, Customs acted under its prior orders from

Commerce and liquidated fourteen entries of Top Line's tube fittings. On June 18, 2002—after

it was clear that liquidation had been enjoined—Customs port officials advised Top Line of the

liquidations and advised Top Line of the need to protest them in order to avoid finality. Top Line

paid all duties indicated on Customs' invoices, which were issued as a result of the enjoined

liquidations, Pl.'s Mem. in Supp. of Contempt Mot., Ex. 2, O'Donnell Aff. at ¶ 5, and which

itemized the duties and fees assessed by Customs on each entry. See Pl.'s Mem. in Supp. of

Contempt Mot., Ex. 2, Watson Aff., Exs. Top Line filed a protest on July 22, 2002. Id.

Customs refused Top Line's request to reverse these liquidations.

On August 29, 2002, Top Line filed a motion for an order to show cause why the

Government should not be held in contempt pursuant to Rules 7 and 63 of this Court. The

motion asked the court to order Customs to reverse the liquidations and pay the costs and

---

[1] Effective March 1, 2003, the U.S. Customs Service was renamed the Bureau of
Customs and Border Protection of the United States Department of Homeland Security. See
Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. 108–32,
at 4 (2003). For ease of discussion, this opinion refers to both incarnations as "Customs."

attorney fees incurred by Top Line in protesting the June 7 liquidations. The court heard oral argument on the motion on April 6, 2004.

At oral argument, the Government waived any other action on the motion for order to show cause. Accordingly, the court proceeded directly to the underlying issue of whether the Government should be held in contempt. At the conclusion of oral argument, the court gave the parties two weeks in which to agree on a procedure that would cancel the liquidations and return to Top Line the monies it paid on those liquidations. At the end of the two weeks, the Government submitted to the court a status report describing the Government's intention to reliquidate the entries and make refund with interest on or before June 19, 2004. Def.'s Status Report (Apr. 20, 2004). Top Line opposed this arrangement primarily because it failed to reimburse Top Line for the costs and attorney fees incurred in the course of the protest and litigation. Pl.'s Resp. to Def.'s Status Report (Apr. 21, 2004).

In the ruling of April 29, 2004, the court rejected the Government's proposed reliquidation remedy on the ground that "any liquidation is enjoined, and cancellation and refund are the proper remedies." Allegheny Bradford, Slip Op. 04–44 at 20. In providing for the proper remedies, the court notified the parties that, "[i]f the Government makes refund with interest of the monies exacted pursuant to the enjoined liquidation on the schedule set forth on its status report, any contempt which may have existed would be purged." Id. The Government made refund accordingly, and no contempt finding was made. Top Line now seeks attorney fees and expenses in connection with the proceedings related to the injunction.

**DISCUSSION**

Top Line seeks attorney fees and expenses pursuant to Section 2412(b) of the EAJA,

which permits an award where the United States acts in bad faith, 28 U.S.C. § 2412(b), and

Section 2412(d), which provides an award to a prevailing party unless "the position of the United

States was substantially justified or that special circumstances make an award unjust."  28 U.S.C.

§ 2412(d)(1)(A).  Because Top Line prevails on the latter claim but not the former, the following

analysis focuses mainly on Top Line's Section 2412(d) claim and the calculation of the award.

Under Section 2412(d), "a trial court must award attorneys fees where: (i) the claimant is

a 'prevailing party'; (ii) the government's position was not substantially justified; (iii) no 'special

circumstances make an award unjust'; and (iv) the fee application is timely submitted and

supported by an itemized statement."  Libas, Ltd. v. United States, 314 F.3d 1362, 1365 (Fed.

Cir. 2003) (summarizing 28 U.S.C. §§ 2412(d)(1)(A), (B)).[2]  Top Line clearly prevailed,

obtaining a remedy for the illegal liquidations and as well as a reversal of Commerce's  scope

determination, see Allegheny Bradford, Slip Op. 04–44; Allegheny Bradford, Slip Op. 04–59,

although attorney fees are not sought or awarded in connection with the merits of the scope

litigation.  The Government contests only the substantial justification for its position and the

amount claimed by Top Line in its fee application.

---

[2]  The EAJA also imposes eligibility requirements on a prevailing party.  A for–profit corporation is an eligible "party" if it has a net worth not exceeding $ 7,000,000 and not more than 500 employees at the time the civil action was filed.  28 U.S.C. § 2412(d)(2)(B)(ii).  The court finds that Top Line satisfies this requirement.  See Pl.'s Fee Application, Ex. C, Aff. of Top Line Vice President Kevin J. O'Donnell, at ¶ 3 (affirming that Top Line meets the eligibility criteria).

## I.    THE GOVERNMENT'S POSITION WAS NOT SUBSTANTIALLY JUSTIFIED

The "not substantially justified" element is a pleading requirement that, once pled by the applicant, imposes upon the Government "the burden of establishing 'that the position of the United States was substantially justified.'" Scarborough v. Principi, 124 S. Ct. 1856, 1866 (2004) (quoting 28 U.S.C. § 2412(d)(1)(A)).  Top Line alleges that the position of the Government was not substantially justified, and thereby imposes the burden on the Government to establish substantial justification.  Pl.'s Fee Application at 4.  The Government fails to carry its burden.

"Substantial justification" means "'justified in substance or in the main'–that is, justified to a degree that could satisfy a reasonable person."  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  The Government meets this standard if it shows that its position had a "reasonable basis both in law and in fact," but fails if it can only show that it is "merely undeserving of sanctions for frivolousness."  Id. at 565–66 (quotations and citations omitted).  In evaluating the Government's position, a court must adhere to the substantial justification standard rather than "redundantly applying whatever substantive rules governed the underlying case."  Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States, 837 F.2d 465, 467 (Fed. Cir. 1988) (citations omitted).

In the instant case, the Government took the position that it was prevented from remedying the wrongful liquidations of Top Line's tube fittings by statute and binding precedent. Specifically, the Government refused to restore the status quo ante on the grounds that Congress had not empowered Commerce to do so.  The Government cited 19 U.S.C. §§ 1514, 1515 (2002)

and several Federal Circuit cases to support its view that liquidations performed in violation of a court order must be challenged at the administrative level, where—under § 1515(a)—Customs has two years within which to rule on a protest. See, e.g., United States v. Cherry Hill Textiles, Inc., 112 F.3d 1550, 1557 (Fed. Cir. 1997) ("the underlying policy of section 1514 . . . is to channel challenges to liquidations through the protest mechanism"); see also Omni U.S.A., Inc. v. United States, 840 F.2d 912, 915 (Fed. Cir. 1988).

The Government's attempt to justify its inaction on the basis of these authorities was not only a losing endeavor, it was not substantially justified. As stated in the court's prior ruling, the authorities cited by the Government require that Customs determinations are protested first to Customs; they do not require that an importer must exhaust the Customs protest procedure when Customs acts ministerially to implement an instruction from Commerce that violates a court order. See Allegheny Bradford, Slip Op. 04-44 at 12 ("These interpretations of § 1514, including their rejection of the voidance doctrine, are distinguished from the instant case by the fact that they did not involve a violation of a court order."). To construe § 1514 and § 1515 as precluding prompt refund for a liquidation in violation of a court order requires the acceptance of at least two erroneous propositions that are so glaringly flawed as to deprive the Government's position of a reasonable basis in law.

First, the Customs protest procedure provided in § 1514 was clearly inappropriate to address a violation of a court order. In the wake of the illegal liquidations, the Government insisted that Top Line first petition Customs for a remedy for illegal liquidations. Courts have the inherent power to enforce their orders, Chambers v. NASCO, 501 U.S. 32, 46 (1991), and the court is unaware of any authority that would have led the Government to believe that it is the

province of administrative agencies to evaluate first whether a violation of an order should be remedied. On several prior occasions, this Court has rejected arguments that its orders require less than full compliance. See AK Steel Corp. v. United States, 281 F. Supp. 2d 1318, 1321 (Ct. Int'l. Trade 2003) ("it greatly disturbs the Court that the government apparently takes the position that it can disobey an injunctive order of this Court with impunity"); Yancheng Baolong Biochem. Prods. Co. v. United States, 277 F. Supp. 2d 1349, 1364 (Ct. Int'l Trade 2003) ("The proper means to enforce an order of this Court against the Government is to seek relief in this Court; it is not to file a protest with Customs."); D&M Watch Corp. v. United States, 16 CIT 285, 295–96, 795 F. Supp. 1160, 1168–69 (1992) (stating that the attempt of Customs to evade the effect of a judgment "tends to diminish the dignity of and respect for judicial review and the resultant process").

Even assuming for the sake of argument that the Government may be excused for ignoring the prerogative of the court, anything more than a superficial consideration of the Government's position would have revealed the futility of an administrative protest pursuant to 19 U.S.C. § 1514. Not only was there no question as to the validity of the order or the Government's violation of the order, but Customs did not make a determination that would trigger § 1514. Section 1514 provides for protests of Customs determinations, but not for protests of the ministerial actions performed by Customs in this case. See Shinyei Corp. of Am. v. United States, 355 F.3d 1297, 1304 (Fed. Cir. 2004) (holding that § 1514 does not apply where Commerce is alleged to have committed an error in providing liquidation instructions); see also Yancheng, 277 F.Supp. 2d at 1364; Springfield Indus. v. United States, 11 CIT 123, 655 F.Supp. 506, 507 (1987). In short, there was nothing for Customs to review and thus no reason why the

Customs protest procedure in § 1514 should preclude prompt relief for Top Line. Given the manifest inapplicability of § 1514, the Government's position is not justified to a degree that could satisfy a reasonable person.

Second, the administrative protest advocated by the Government would have defeated the purpose of the injunction by negating the temporary protection it afforded Top Line. Aside from the argument regarding the Customs protest procedure, the premise for the Government's refusal to remedy the violation of the court's order amounted to little more than the observation that Congress, in title 19, did not provide instructions for Commerce in the event that Commerce failed to comply with the temporary injunction it made available in 19 U.S.C. § 1516a(c)(2). See Def.'s Br. at 15 ("Initially, it was not clear how Customs could properly render a decision upon the merits of the protest without a final resolution of this litigation."). The Government should have been alerted to the inadequacy of this position by its inherent contradiction: it sought to deprive Top Line of the very thing granted by the court's temporary injunction, that is, protection from liquidations during the pendency of the antidumping litigation. Brought to its logical conclusion, the Government's position would eviscerate the protective power of § 1516a(c)(2) injunctions: the Government—though it attempts to observe injunctions—would be excused from such injunctions if it should fail to comply. It is unjustifiable to construe an injunction using mandatory language as meaning that the enjoined party is required only to use its best efforts. Further, it is unreasonable to require Top Line—the party protected by the injunction—to bear all the costs of enforcing the injunction. Accordingly, Top Line is entitled to attorney fees and expenses.

## II.  AN AWARD OF ATTORNEY FEES AND EXPENSES PURSUANT TO 28 U.S.C. § 2412(b) IS INAPPROPRIATE

Before assessing the fees and expenses owed to Top Line, the court addresses briefly Top Line's request for fees under the common law "bad faith" exception to the American Rule that each litigant bears its own attorney fees and expenses.  See 28 U.S.C. § 2412(b) (providing for attorney fees and expenses to a party prevailing against the United States "to the same extent that any other party would be liable under the common law"); F.D. Rich Co., Inc. v. United States, 417 U.S. 116, 129 (1974) ("attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons").

Government officials are presumed to have acted in good faith.  United States v. Roses, Inc., 706 F.2d 1563, 1566 (Fed. Cir. 1983) (citing Kalvar Corp. v. United States, 543 F.2d 1298, 1301 (Ct. Cl. 1976)).  Here, the Government's actions—liquidating merchandise in violation of a court order and then refusing to provide a remedy—were "sufficient to support a finding of contempt," but the Government was not held in contempt.  Allegheny Bradford, Slip Op. 04–44 at 19.  The court's ruling of April 29, 2004, provided that the Government would purge "any contempt which may have existed" by refunding the monies exacted from Top Line.  Id. at 20. The Government did so.  Although it should have been unnecessary to inform the Government that its position was unjustifiable, the court finds it inappropriate to make a finding of bad faith after the Government's prompt compliance with its ruling.  Cf. D&M Watch Corp., 16 CIT at 299, 795 F. Supp. at 1172 (finding bad faith after the government delayed litigation over ten years); see also Kalvar Corp., 543 F.2d at 1301 (requiring "well-nigh irrefragable proof" that the government was motivated by malice or a specific intent to injure a private party); United States

v. Standard Oil Co., 603 F.2d 100, 103 (9th Cir. 1979) (applying the bad faith exception "only in exceptional cases and for dominating reasons of justice").

## III.   AWARD OF FEES AND EXPENSES

The court finds it appropriate to award attorney fees pursuant to Section 2412(d)(2)(A) of the EAJA.  The court has reviewed the billing details submitted by Top Line, and finds reasonable the amount of time assessed to the tasks performed.  Top Line requests an award of attorney fees and expenses in the amount of $53,132.23.  This calculation assumed that fees would be available pursuant to the Section 2412(b) bad faith exception.  Consequently, Top Line failed to provide sufficient evidence from which to determine whether any of its attorneys justified a higher fee than the statutory rate for reasons such as a limited number of "qualified attorneys for the proceedings involved."  See 28 U.S.C. § 2412(d)(2)(A)(ii).  Top Line also failed to provide any  information pertaining to the market rate for paralegals, and consequently the 1.25 hours billed by one paralegal are not counted.  Although the amount awarded by the court may not cover completely the costs incurred by Top Line in obtaining relief from the illegal liquidations, the award is consistent with the purpose of the EAJA.  See Phillips v. Gen. Servs. Admin., 924 F.2d 1577, 1584 (Fed. Cir. 1991) ("Congress did not intend the EAJA to completely cover attorney fees.").

The court's award is calculated using the statutory rate of $125, with upward adjustments for cost of living.  For the cost of living adjustment, the court uses the data provided by the Bureau of Labor Statistics of the United States Department of Labor.   As a baseline for the cost of living increase, the court uses the Consumer Price Index–All Urban Consumers ("CPI–U")

data for March 1996, the month during which the $125 hourly rate cap became effective. <u>See</u> <u>Former Employees of Tyco Elecs., Fiber Optics Div. v. United States</u>, No. 02–00152, Slip Op. 04–118 (Ct. Int'l Trade Sept. 16, 2004). The base CPI-U (not seasonally adjusted) for March 1996 was 155.7. <u>Id.</u> at 31; <u>see also</u> Consumer Price Index - All Urban Consumers, <u>available</u> <u>at</u> http://www.bls.gov/cpi/ (last visited Dec. 14, 2004). The cost of living increase is measured from the 155.7 baseline to the CPI–U data for Northeast Urban Areas for the time periods in which Top Line incurred attorney fees.

For the 76.9 attorney hours billed in 2002, the court uses 189.5, the CPI-U for Northeast Urban Areas for the second half of 2002. The CPI–U of 189.5 is a 21.7 percent increase from 155.7, and a 21.7 increase from $125 yields an hourly rate of $152.14. The court awards attorney fees of $11,699.22 for 2002.

For the 11.9 attorney hours billed in 2003, the court uses 192.2, the CPI-U for Northeast Urban Areas for the first half of 2003. The CPI–U of 192.2 is a 23.4 percent increase from 155.7, and a 23.4 percent increase from $125 yields an hourly rate of $154.30. The court awards attorney fees of $1,836.21 for 2003.

For the 43.1 attorney hours billed in 2004, the court uses 198.6, the CPI-U for Northeast Urban Areas for the first half of 2004. The CPI–U of 198.6 is a 27.6 percent increase from 155.7, and a 27.6 increase from $125 yields an hourly rate of $159.44. The court awards attorney fees of $6,871.92 for 2004.

The court awards total attorney fees of $20,407.35. The court also awards expenses for duplicating, electronic legal research, postage, and other miscellaneous charges in the amount of $7,608.43. In sum, the court awards $28,015.78 for attorney fees and expenses.

**CONCLUSION**

The court determines that, pursuant to Section 2412(d) of the EAJA, the Government was not substantially justified in its litigation position in this matter. Accordingly, the court awards Top Line attorney fees and expenses in the amount of $28,015.78.

SO ORDERED.

/s/ Jane A. Restani
Jane A. Restani
Chief Judge

Dated: This 23rd day of December, 2004.
New York, New York